## DUNLAP HARDWARE CO. v. JAY *et al.*
## SHEFFIELD HUNNINGTON CO. v. JAY *et al.*

Upon the facts appearing in the record, the trial judge did not abuse his discretion in dissolving the attachment under which the goods of the defendants had been by his order previously seized.

Submitted June 3, — Decided July 8, 1897.

Attachments. Before Judge Smith. Irwin superior court. August 8, 1896.

Upon the petition of the Dunlap Hardware Company, an at-

tachment, founded upon an account made with the petitioners by J. L. Jay & Son, beginning in February 1896, and ending in April, 1896, upon which a balance of $377.21 was claimed to be due, was, on June 6, 1896, issued by the judge of the superior court against J. L. Jay, D. B. Jay and W. T. Jay, as partners composing the firm of J. L. Jay & Son, and was, on June 16, 1896, levied on all the stock of merchandise of J. L. Jay & Son in the town of Fitzgerald, the ground of attachment being that J. L. Jay & Son, on May 5, 1896, sold and conveyed to W. T. Jay their property liable for the payment of their debts, for the purpose of avoiding the payment of the same. The defendants made application to the judge who had issued the attachment to remove the same, upon the grounds that the partnership of J. L. Jay & "Sons" was dissolved on October 1, 1895, and W. T. Jay was not a member of the firm of J. L. Jay & Son when the indebtedness due to the plaintiff was contracted, and that the plaintiff knew this when it sold to J. L. Jay & Son, who were then doing business in Fitzgerald, they having moved their business from Albany to Fitzgerald, Ga., shortly after the withdrawal of W. T. Jay from the firm of J. L. Jay & Son; that the sale of the stock of goods and merchandise levied on was made to him by J. L. Jay and D. B. Jay, so far as he and they were concerned, in good faith and without any intention to wrong, defraud or injure any of the creditors of J. L. Jay & Son; that the stock of goods was conveyed by them to him to pay him the amount of $600, with interest, as secured by a mortgage on the stock made to him by J. L. Jay and D. B. Jay, and to secure him against his endorsement of the papers of J. L. Jay and D. B. Jay, which papers were secured by mortgages made by them to the holders thereof, to wit: Commercial Bank of Albany, Ga., $1,000, with interest; Shellman Banking Company of Shellman, Ga., $562.50; the Colony Bank of Fitzgerald, $500; Jesse W. Walters of Albany, Ga., $500; and Mrs. Anne M. Jay, $1,100; and to enable W. T. Jay to sell the stock without sacrifice to pay the mortgage and endorsed debts.

The judge, after hearing evidence, revoked his order granting an attachment, and dismissed the attachment, and the

plaintiff in attachment excepted, alleging that the court erred, because: (1) The bill of sale under the law is void, and the property conveyed by it is subject to attachment. (2) It is void because it appears upon the face of the bill of sale and from the evidence, that J. L. Jay & Son were insolvent at the time of the execution of the same, and that the property conveyed to W. T. Jay was delivered to him, not on a contract of absolute sale to him, but with the understanding that he was to pay over to other creditors, either a part of the property or a part of the proceeds, and retain the balance on a debt due him; and the evidence and the bill of sale show that W. T. Jay was to pay the other creditors named in the bill of sale out of the proceeds of the property conveyed to J. L. Jay & Son, and not out of his own means. (3) The bill of sale is void because W. T. Jay did not in it stipulate to pay the creditors named in it out of his own means, and not out of the property conveyed to him. (4) Under the evidence and the law, the conveyance by bill of sale was fraudulent and void, and J. L. Jay & Son sold and conveyed to W. T. Jay their property liable for the payment of their debts, for the purpose of avoiding the payment of the same. (5) Under the law and facts, so far as the plaintiff in error is concerned, W. T. Jay was a partner, and as such he is liable to it; the conveyance to him is fraudulent and void and the property subject to attachment, and his claim should be postponed to its claim; and the conveyance to him hinders and delays creditors. (6) Notice of the dissolution of the firm of J. L. Jay & Sons, given to H. C. Kendall, salesman of plaintiff in error, is not and was not sufficient and legal notice.

The bill of sale from J. L. Jay & Son to W. T. Jay was as follows: "State of Georgia, and County of Irwin. Whereas Messrs. J. L. Jay & Son, a firm composed of J. L. Jay and D. B. Jay, are now indebted to W. T. Jay, of Shellman, in the sum of six hundred dollars, with interest on the same, and whereas he, the said W. T. Jay, heretofore endorsed our paper upon which we have borrowed money which is unpaid, to wit, from the Commercial Bank of Albany, Ga., for one thousand dollars with interest and all costs, and from the Shellman

Banking Company of Shellman, Ga., for five hundred and sixty-two and 50-100 dollars, and he the said W. T. Jay being liable together with us on said debts, and he being an accommodation endorser thereon, and whereas the above sums have been secured this day by mortgages to the said parties, and whereas we are further indebted to the Colony Bank of Fitzgerald, Irwin county, said State, in the sum of five hundred dollars and interest and costs, and that debt being secured by mortgage, and whereas we are further indebted to Jesse W. Walters, of Albany, Ga., in the sum of five hundred dollars, and to Mrs. Annie M. Jay in the sum of eleven hundred dollars, which said last two debts are secured by mortgages; now, for and in consideration of the assumption of these above described debts and the payment thereof to be made to the parties therein named, and we being relieved from said debts by the said W. T. Jay, and the said mortgages above described to remain as a lien on the property therein described until fully paid and discharged, and the further consideration of payments to us of one dollar"; then follows the clause conveying to the said W. T. Jay all the property levied on by the attachments. This bill of sale was executed on May 5, 1896, and recorded May 7, 1896, in Irwin county, Ga. Besides the bill of sale the following evidence was introduced at the hearing: Affidavit of W. T. Jay: He is a resident of Randolph county, Georgia, and has been for several years. He was for a short while a member of the firm of J. L. Jay & Sons at Albany, Ga., composed of himself, D. B. Jay and J. L. Jay. He retired from the firm on October 1, 1895, and had no further connection therewith. About November 1, 1895, J. L. and D. B. Jay moved to Fitzgerald and opened business under the firm name of J. L. Jay & Son. He was never at any time a member of that firm and had no interest in it. At the request of his father and D. B. Jay he endorsed the notes of the firm to the Commercial Bank of Albany for $1,000, and to the Bank of Shellman for $562.50, and the firm borrowed these sums from said banks. He afterwards loaned them $600, and gave a check signed "J. A." (?) [Jay] Payne & Co., and [it was] paid by the Commercial Bank. In May, 1896, he was tele-

graphed to go to Fitzgerald. While there he was asked to look after the stock of J. L. Jay & Son, D. B. Jay being sick and unable to give the business any attention, and J. L. Jay having no active management of the business. He did so, and soon found out that the business was in bad shape, and that he was in a position to lose his money and still be liable on the endorsements. He used his best efforts to borrow from the Bank of Fitzgerald enough money to carry the business through the dull season, but was unable to do so, and failing to make any arrangements that would enable the business to be carried on, he, upon the urgent request of J. L. Jay and D. B. Jay, bought the stock as shown by the bill of sale. He took stock to ascertain the amount of goods on hand, and found that at the date of the bill of sale they had on hand $5,616.69, and owed him, and other creditors they desired to pay, about $5,252. Much of the stock consisted of store fixtures and stock not very salable. He saw this was the best way to protect himself, and he bought the same as any prudent man would have done, knowing that it was doubtful, after paying clerk-hire, store-rent and all legitimate expenses, that he could pay off the debts and save his money. There was nothing wrong or fraudulent in the matter; no design to delay, hinder or defraud any one. It was a plain, open business transaction. It was the desire on one part to pay debts, and on the other to collect. When he retired from the firm of J. L. Jay & Sons at Albany, they tried to notify all parties they had dealt with that he had retired. He knows that he did in person in Albany, soon after he retired, give personal notice to H. C. Kendall, the traveling salesman of the Dunlap Hardware Company, that he had withdrawn and had no further connection with the plaintiffs. Subsequent dealings show the same. The price he paid for the stock was fair and full value at the time, and would not at public sale have been realized. He knew that he could only do so by adding new goods and selling off at retail and in small lots. He has not received one cent from the stock as a result of the purchase he made. He probably stated while trying to borrow money, or assisting his father and brother to borrow money, that the assets would

amount to some $12,000, but he meant by that the real estate owned in Americus and Albany, Ga. The amount of the goods received in the sale was of the cost value above stated. He made sale of goods while acting for the firm during the sickness of his brother, and turned the money over to the firm. It amounted to about $600.

Affidavit of W. T. Jay and R. E. Lee, that they made, on or about April 27, 1896, an inventory of the stock of goods of J. L. Jay & Son conveyed by bill of sale to W. T. Jay, and the goods aggregated in value $6,212.19. This was a full and just valuation; the value placed on the goods was arrived at by referring to the invoices of the goods shipped to J. L. Jay & Son, and by the cost-marks on the goods. They inventoried all the goods contained in the two stores and barn of J. L. Jay & Son, and all of the goods conveyed by the bill of sale above referred to, of every nature whatsoever.

Affidavit of D. B. Jay, that he was managing partner of J. L. Jay & Son. W. T. Jay was not at any time a member of the firm, but had been a member of the firm of J. L. Jay & Sons of Albany a short while in 1895. He gave notice of the same to H. C. Kendall, the traveling salesman of the Dunlap Hardware Company. They "so recognized the same" and had all further dealings with J. L. Jay & Son. All the debt of J. L. Jay & Sons, made with such firm at Albany, was fully paid; and the debt they now sue for was made with J. L. Jay & Son of Fitzgerald after they opened at that place. They tried to notify all parties with whom they dealt of the withdrawal of W. T. Jay. He has read or heard read the affidavit of W. T. Jay and adopts it as far as it goes, and says it is true. The debt to his wife and mortgage given by J. L. Jay & Son to cover the same is a just and true debt. The firm of J. L. Jay & Son received from Mrs. Jay the sum named in the mortgage and bill of sale, and put it into their business, and they are now liable to her for it and feel as much bound to pay it as any other debt they owe. This money was derived from the separate estate of Mrs. Jay coming from the sale of land received from her father's estate. There was no fraud in the sale to W. T. Jay. It was made in good faith. They had become unable to run

their business after trying their utmost to do so, and had paid their debts as fast as they could get the money, and for sixty days prior to the sale of the stock to W. T. Jay they had paid to various creditors, in legitimate expenses of the business, about $5,000 in cash. The firm of J. L. Jay & Son reserved nothing in the sale, but sold all the stock at a full and fair value to pay their debts. Said stock, if sold as stocks of bankrupt goods are usually sold, would not have brought more than 60 or 70 per cent., and by their sale they were able to pay more debts than they could if the stock had been sold at public sale.

Affidavit of Jesse S. Clark, in which, in addition to the facts stated in the preceding affidavits, he stated that soon after the withdrawal of W. T. Jay from the business and the change in the firm name, both he (affiant) and D. B. Jay informed the Dunlap Hardware Company, through their traveling salesman H. C. Kendall, of the withdrawal of W. T. Jay. The withdrawal was generally known in the business world, and special notice was given a number, if not all, of the firms with which J. L. Jay & Sons had been dealing.

Affidavit of T. M. Ticknor, cashier of the Commercial Bank of Albany, that on March 4, 1896, a draft attached to the affidavit was presented to the bank for payment and was paid out of the funds belonging to Jay, Payne & Company, of which firm W. T. Jay was a member. The bank now holds a mortgage executed to it by J. L. Jay & Son of Fitzgerald, upon the stock of merchandise at Fitzgerald, for $1,000 principal, besides interest and costs and attorney's fees. This mortgage was given to secure the bank for a loan made by it to J. L. Jay & Son, a firm composed of J. L. Jay and D. B. Jay, and endorsed by W. T. Jay. Affiant knows that W. T. Jay was not a member of the firm of J. L. Jay & Son. The mortgage is just and true, and no part of the debt secured by it has been paid. Attached to the affidavit were a draft and a note as follows:

"Albany, Ga., Feb. 28, '96. Commercial Bank of Albany, Georgia, pay to the order of J. L. Jay & Son six hundred and fifteen dollars. $615.00.                      Jay, Payne & Co.,

Endorsed "J. L. Jay & Son."                      per D. B. Jay."

"$600.   Thirty days after date we promise to pay to W. T.
Jay the sum of six hundred dollars for value received.

                              "J. L. Jay & Son, per D. B. Jay."

W. T. Jay testified that the discrepancy between the check
and note arose by his getting $15 from D. B. Jay out of pro-
ceeds of the check.   He took in from the sale of the stock
conveyed to him $500, and paid out $800, to keep up the
stock, which was shown by the books in his hands and which
were then before the judge.

Movants put in evidence a number of bills rendered by the
Dunlap Hardware Company to J. L. Jay & Son for parts of
the account sued on.   There was evidence that letters headed
in print "J. L. Jay, D. B. Jay, W. T. Jay—J. L. Jay & Sons,"
signed "J. L. Jay & Son," dated at Fitzgerald, Ga., January
10, 1896, February 17, 1896, and February 19, 1896, and di-
rected to the Sheffield Hunnington Company, were received
by the latter, and that a letter with a like heading, and dated
at Albany, Ga., October 10, 1895, was received from J. L. Jay
& Sons by the Dunlap Hardware Company.   Accounts run-
ning to April, 1896, made out by J. L. Jay & Son on bill-
heads with a heading like that on the letters above mentioned
were introduced in evidence.   Also copies of a newspaper, the
Albany Herald, of dates commencing November 10, 1895,
and ending January 24, 1896, containing the advertisement
of J. L. Jay & Sons.   Also affidavit of the vice-president and
manager of the Dunlap Hardware Company, that J. L. Jay &
Sons commenced to buy goods from that company in January,
1894, in Albany, Ga., and continued to buy goods from it up
to April 21, 1896, and that neither J. L. Jay & Sons nor W.
T. Jay at any time informed the Dunlap Hardware Company
that W. T. Jay had withdrawn and was no longer a member
of the firm.   Affidavit of the officers of the Sheffield Hun-
nington Company, that their company had been running an
account and doing business with J. L. Jay & Sons from April,
1894, to February 24, 1896, and to the best of their knowl-
edge and belief, at the time the account upon which the
Sheffield Hunnington Company has obtained an attachment
against the firm began (September 2, 1895), the firm was

composed of J. L. Jay, W. T. Jay and D. B. Jay; and neither the affiants nor their company have ever received any notice of the dissolution of the firm or the retirement of any member of it. Affidavit of the tax-collector of Randolph county, that in 1895 W. T. Jay gave in for taxation assets valued at $1,785, and in 1896 $1,770. Affidavit of Frank S. Bander, that on or about March 23, 1896, D. B. Jay said that an inventory was then being made of the stock of merchandise belonging to the firm of J. L. Jay & Son, and it was his opinion, based upon the part of the inventory that had been completed, that the invoice value of the stock of merchandise belonging to the firm in Fitzgerald was then about $14,000. Affidavit of C. P. Milligan, that he was in the employment of J. L. Jay & Son in Fitzgerald until March 5, 1896, at which time they attempted to convey to W. T. Jay their stock of merchandise in Fitzgerald. Affiant then became an employee of W. T. Jay and continued in his employment until about June 16, 1896. He was familiar with the stock, and its amount and value were about the same on May 5, 1896, as on March 23, 1896, with the exception of about $800 worth of sashes, doors and blinds which had been sold in the meantime. Subsequent to May 5, 1896, and prior to the levy of the attachments, a large amount of the stock of merchandise of the value of about $1,500 was removed from the storehouse known as "Jay's Midway Store," by W. T. Jay, and placed in a small storehouse on Thomas street in Fitzgerald, which had just prior to the removal been occupied by R. M. Easters, a brother-in-law of W. T. Jay, as a grocery-store, and they were kept under lock and key for some time, and were being so kept at the time of the levy of the attachment. Shortly after the levy, these goods were removed from their place of concealment and conveyed to some place unknown to deponent. W. T. Jay was in Fitzgerald for some few days prior to May 5, 1896, and spent most of the time in the stores of J. L. Jay & Son, and then had ample opportunity for acquainting himself with the general condition of the business of J. L. Jay & Son.

W. T. Jay testified, that he never had or concealed any goods

in the storehouse formerly occupied by Easters, as stated in the affidavit of Milligan; that the goods put in that house were put in openly, and were offered publicly for sale, and that the house was not kept under lock and key. This was done as a matter of convenience, as the other stores were crowded.

D. B. Jay testified, that the reason the letter-heads and bill-heads of J. L. Jay & Sons, with the names of J. L. Jay, D. B. Jay and W. T. Jay on them, were used, was because they had them on hand and neglected to make the change; and that W. T. Jay did not know they were being used. He can not swear positively that notice of the withdrawal of W. T. Jay was conveyed to the Sheffield Hunnington Company, but is positive that they had actual notice of the same.

*Jones & Bacon*, for plaintiffs.

SIMMONS, C. J.   The two cases here decided are identical as to their facts, in so far as the same are material.   Attachments were issued under section 4543 et seq. of the Civil Code, and were subsequently "removed" by the judge, as provided in section 4546.   The plaintiffs in attachment excepted to the ruling of the court dissolving the attachments, and bring the cases here for review.   The testimony is somewhat conflicting, but there is ample evidence to warrant the conclusion that the conveyance of the property was made in good faith and without any intention to delay or defraud creditors.   This being so, and the trial judge having dismissed or "removed" the attachments, we are controlled by the decision of this court where it was held: In a case in which "the testimony leaves it doubtful, to say the least, whether the transaction in question was bona fide or fraudulent, the preponderance is rather in favor of its fairness.   This is the conclusion at which the judge trying the issue, both as court and jury, arrived," that "On an application to dismiss an attachment granted ex parte on the ground of a fraudulent transfer of property by the debtor, the decision of the judge on disputed facts may be reviewed; but in making such judgment, he is allowed the exercise of a sound discretion similar to that which he has in cases

of injunction; and such discretion will not be controlled unless it plainly appears to have been abused." *Falvey* v. *Adamson*, 73 *Ga.* 493.

Under the facts appearing in the records of these cases, the trial judge did not abuse his discretion in dissolving the attachments under which the goods of the defendants had been by his order previously seized.

*Judgment affirmed. All the Justices concurring.*